[No. A074730. First Dist., Div. Three. Mar. 5, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
GOODWIN R. BRODIT, Defendant and Appellant.

[No. A079648. First Dist., Div. Three. Mar. 5, 1998.]

In re GOODWIN R. BRODIT on Habeas Corpus.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II, sections B-F.

**COUNSEL**

Mark Shenfield, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, and George F. Hindall III, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**PARRILLI, J.**—A jury convicted appellant Goodwin R. Brodit of a single count of continuous sexual abuse of a child (Pen. Code, § 288.5). The trial court sentenced appellant to the mitigated term of six years in prison. Appellant filed a timely appeal and a petition for writ of habeas corpus.

Appellant raises 10 separate issues in this consolidated proceeding. The most significant issues concern the admission of hearsay evidence under recently enacted Evidence Code sections 1360 and 1253. Those sections permit the court to admit a child abuse victim's hearsay statements under certain specified conditions. Appellant contends, among other things, that sections 1360 and 1253 violate due process because they unfairly shift the

"balance of forces" to the prosecution. We reject each of appellant's contentions, affirm the judgment, and deny the petition for writ of habeas corpus.

I

FACTS

Appellant's brother, John, and John's wife, Arcel were married in January 1992. Each had two minor children from prior marriages: Mica and John-John were John's children, and Angelo and Athena were Arcel's children. In March of 1992, the newly married couple and the four children moved into a two-story, four-bedroom house in Pittsburg, California.

John's younger brother, appellant Goodwin Brodit, was a frequent visitor and overnight guest from the time John and Arcel first moved into the Rolfe Drive residence. In early 1993, appellant began living at the Rolfe Drive house. He lived there until October of 1993, when he had an argument with Arcel and moved out at her request. However, he moved back into the residence in early 1994 and lived there throughout that year.

In the meantime, John and Arcel's marriage was deteriorating. In May 1994, Arcel and her two children moved out of the Pittsburg house, but they returned five months later, in September 1994. In early November 1994, Arcel and her children again moved out of the Pittsburg residence. They stayed briefly with Arcel's brother, Lito, and then moved in with Arcel's mother.

On the weekend of January 21-22, 1995, Arcel, who was hoping to reconcile with John, went with him on a trip to Reno. She left her children with her mother, Estrelita. Arcel did not return to her mother's home until Monday night.

On that Monday morning, Athena, who was then nine years old, stayed home from school because she was not feeling well. According to Estrelita, Athena had complained of vaginal and abdominal pain that morning. She had made similar complaints on numerous occasions since she was eight. Estrelita believed the pain was due to Athena's failure to practice good personal hygiene. Estrelita washed Athena's genitals with soap and warm water, as she had on prior occasions, and told Athena to be more careful about washing herself and not to let anyone touch her there. Athena appeared sad after Estrelita made this comment. Estrelita asked her if anyone had hurt her or touched her. Athena seemed reluctant to answer. Estrelita asked her if her stepfather, John, had hurt her. She replied, "No, Grandma. It's Uncle

Goodwin." She then told Estrelita appellant had sexually molested her while they had lived together at the Pittsburg house.

Estrelita telephoned a friend who was a registered nurse and asked her to come examine Athena. Estrelita's friend spoke briefly with Athena and conducted a cursory examination of her vagina. The friend told Estrelita to contact child protective services. Estrelita did so. Estrelita did not tell Arcel about Athena's allegations when she arrived home that evening, because Estrelita did not want Arcel to think she had concocted the story to prevent Arcel from reconciling with John. She wanted a doctor to check Athena before she told Arcel about the allegations.

The next day, Jack Rodgers, a child abuse investigator with the department of social services, interviewed Athena at her school. Athena corrected Rodgers when he initially suggested it was her stepfather, John, who had molested her. She said, "No, it was my uncle." Using anatomically correct drawings, Rodgers determined Athena used words that sounded like "ting-ting" for penis and "peck-peck" for vagina.[1] Athena then told Rodgers appellant had touched her "boobs" and her "peck-peck" with his hands, and had put his "ting-ting" inside her "front" and "butt." Athena grimaced as if she were in pain when she made this last statement. Athena denied appellant had made her touch his "ting-ting" or that he had put his "ting-ting" near her mouth. After he interviewed Athena, Rodgers told Arcel and Estrelita not to discuss the allegations with Athena or to allow others to do so. He referred the matter to the police for further investigation.

About four or five days later, Athena's aunt (Arcel's sister), Angie, brought Athena along in her car to a nearby laundromat. Angie had heard about Athena's allegations of sexual abuse, but did not know she was not supposed to discuss them with Athena. While they were riding in the car, Angie told Athena she loved her and that if Athena needed to talk, she could talk to her. Athena indicated she wanted to talk, and told Angie she and appellant had had intercourse in the "front and back." Athena said she felt ashamed and "dirty" because sometimes the sexual acts felt good. Angie assured Athena this was natural, that she had done nothing wrong, and that it was appellant's fault because he was the adult.

Angie also asked Athena about an incident in February or May of 1994 when Arcel, Angie and their brother Anthony were at the Pittsburg residence and found the words "I had sex" and the name "Goodwin Brodit" written in a child's script on appellant's bed frame. The adults had questioned the

---

[1] Athena and Estrelita testified that "teck-teck" and "peck-peck" are Filipino terms for penis and vagina.

children about this at the time, but they denied writing on the bed frame. Athena admitted to Angie it was she who had written "I had sex" on the bed frame, but she had been too ashamed to admit it at the time. Athena could not remember if she had also written the name "Goodwin Brodit" on the frame.

A few days later, Pittsburg Police Detective Eric Solzman, who specializes in sexual assault cases, interviewed Athena at her home out of the presence of her relatives. Athena told Solzman appellant first molested her in the summer of 1992 when she was living at the Pittsburg house. On that first occasion, appellant carried Athena from her bedroom into his. She awoke in his bedroom. Appellant lay on top of Athena, moved her clothing out of the way, put his "thing" in her "front," and then turned her over and put his "thing" in her "behind." Appellant moved up and down while he was on top of her. Afterward, she felt wetness on her bottom which she thought might have been "sweat." Appellant wiped her bottom with a towel when he had finished.

Athena told Detective Solzman appellant molested her in a similar fashion on 20 or more occasions. In addition, she claimed appellant had come into her bedroom at night and sodomized her there on three or four occasions. Appellant warned Athena not to tell anyone about the molestations.

Athena told Solzman the last time appellant molested her was in the fall of 1993, when she was eight years old. She said that, on this final occasion, appellant entered her bedroom while she was asleep, and carried her into his bedroom. As he had in the past, appellant put his "thing" in her "front," and then put his "thing" in her "behind." Afterward, Athena felt wetness on her bottom and appellant wiped her with a towel. According to Athena, her mother and stepfather had a big fight on the night of this incident, and the next day she and her mother moved out of the Pittsburg house.

Family Nurse Practitioner Nancy Jo Elliff conducted a sexual abuse examination of Athena on February 16, 1995. She began the examination by taking Athena's medical history, which included Athena's description of the sexual acts appellant had performed upon her. Athena told Ms. Elliff appellant had touched her genitalia and anus with his hands and had "stuck his thing into [her] front and back part." Athena said these acts hurt sometimes, but that she never saw any bruising or bleeding. She said appellant also sucked her breasts and made her touch his "thing." She claimed appellant would carry her into his bedroom when everyone else was asleep and would have sex with her in his room. Athena said appellant would place a shirt or towel on her behind because "he would start sweating or something." Athena

told Ms. Elliff appellant first molested her when she was seven or eight years old, and last had sex with her on the night before she moved out of the Pittsburg residence. She said appellant molested her on more than 10 occasions.

After Ms. Elliff took Athena's history, she conducted a general physical and gynecological examination. Ms. Elliff noticed some redness on Athena's labia minora that was a nonspecific finding with many possible causes. Ms. Elliff also observed 10 to 12 small nodules below the opening to Athena's vagina. Although Ms. Elliff could not identify the nodules, they did not appear to be genital warts or any other sexually transmitted infection. She did not believe they were evidence of sexual contact.[2] In addition, Athena's hymen appeared to be normal and intact. Ms. Elliff believed this finding was not necessarily inconsistent with vaginal penetration, if the penetration had occurred relatively few times or was only partial. Athena's anus also appeared normal. Ms. Elliff's findings were ambiguous, in that they were consistent with sexual molestation or a lack of sexual molestation.

Susan Kuhn, a marriage and family counseling intern, testified she had been seeing Athena since late February of 1995 on a weekly or biweekly basis. In her first session with Athena, Ms. Kuhn asked her if she knew why she was there. Athena replied she was there because appellant had molested her, and Ms. Kuhn was there to help. Athena was initially reluctant to discuss the sexual abuse. Consequently, Ms. Kuhn suggested that Athena write down what had happened, to "pretend it's like a homework assignment from school." Athena wrote down 11 numbered paragraphs describing the sexual acts appellant performed on her. In particular, Athena wrote that appellant would lay her down on her back or stomach, move her clothing out of the way, stick his "thing' (or "dick") into her "front" (or "private") or in her "back" (or "buttocks"), and kiss her cheek and neck. She wrote that appellant molested her in his bedroom and also in her bedroom and her mother's bedroom. She wrote that appellant would "sometimes . . . grab my hand and make me hold his thing and go up and down" and that the last molestation occurred "the night before my mom and stepdad got into a fight." Athena said she reported the molestations because she was afraid it might happen to other children.

During later sessions, Athena told Ms. Kuhn appellant first started molesting her when she was about eight years old and that he did so three or

---

[2]Dr. James Carpenter, a pediatrician, performed a follow-up sexual abuse examination on January 11, 1996. Dr. Carpenter testified the nodules were most likely genital warts (which would indicate sexual contact) or lymphoid follicles (which would not). Dr. Carpenter later showed slides of the nodules to a group of medical examiners, and the consensus view was that the nodules were more likely lymphoid follicles.

four times per week, usually on school nights. Athena said she felt guilty about the molestation because she did find it physically pleasurable at times. She said she remained fond of appellant because he had otherwise been kind to her, but she was angry and hurt that he had molested her.

Athena, who was then 10 years old, testified at trial. She stated she could not remember when appellant first began molesting her, or how old she was at the time. However, she knew that the first incident, as well as all of the molestations which followed, happened while she and her mother were living at the Pittsburg house. In the first incident, appellant carried Athena into his bedroom, put her on his bed, moved her clothing, and put his "teck-teck" in her "peck-peck" and her "bottom."

Appellant subsequently committed the same or similar acts on more than twenty occasions, usually in his bedroom, but sometimes in her bedroom and, on one occasion, in her parents' bedroom. Appellant would move his body up and down when he placed his "teck-teck" against her. Sometimes he kept his "teck-teck" outside her, and sometimes she felt "something kind of go in a little bit." Athena said appellant's "teck-teck" had a lot of hair on it, that it was soft on the outside, "but if you kind of pressed on it, it would be hard." Appellant sometimes got "sweaty" and tired and used a towel or cloth to wipe "sweat" off of himself and Athena. Athena sometimes felt wet on her buttocks after these incidents. Sometimes appellant hurt her, but sometimes it felt good. Afterward, her "peck-peck" would be red and swollen and she would have difficulty peeing. On one occasion, appellant tried to put his "teck-teck" in Athena's mouth but she pushed him away.

Athena testified she had written the phrase "I had sex," and possibly the name "Goodwin" on the frame of appellant's futon bed. Athena admitted that while she was living at the Pittsburg house, she and her brother Angelo had seen "dirty" videos on her parents' VCR. She at first denied she had seen male genitalia in these videos, but later admitted she had.

Athena could not remember the date the last incident occurred, or how old she was at the time, but recalled the last incident happened the night before her mother and stepfather had a big fight which led to Arcel and her children moving out of the Pittsburg house. Athena testified she liked appellant when they lived together at the Pittsburg house because he was nice to her. She said she was not angry at him, but only angry at the things he had done.

Finally, Dr. Theresa Schuman, a psychologist, testified concerning child sexual abuse accommodation syndrome. We describe this testimony in detail in the portion of the opinion which discusses appellant's objections to this testimony.

*Defense Case*

Appellant took the stand and denied he had ever molested Athena. He said he did not know why she claimed he had.

Appellant admitted he lived in the Pittsburg house from June to November 1993 and from August 1994 to January 1995. His mother also lived in the Pittsburg residence during the period he stayed there in 1993, and he shared a room with her during most of that period.

Appellant's niece Mica, who was nine at the time of trial, testified she never saw appellant asleep in the bunk bed she shared with Athena and never saw Athena asleep in appellant's bed. However, she did see appellant sleeping on the floor of her bedroom on at least one occasion.

A physician testified that he performed a physical examination on appellant in March 1996 and found no evidence of past or present genital warts.

Dr. Lee Coleman, a psychiatrist, testified about child sexual abuse accommodation syndrome for the defense. Dr. Coleman also said he had reviewed the documentation of those who had interviewed Athena, and had serious reservations about the validity of the interview techniques.

Based on this evidence, the jury convicted appellant of a single count of continuous sexual abuse of a child (Pen. Code, § 288.5).

## II

### DISCUSSION

A. *Hearsay Testimony.*

As should be evident from the statement of facts, much of the evidence against appellant consisted of Athena's out-of-court statements relating the circumstances of the molestations to investigators, health professionals, and family. The court admitted this hearsay testimony pursuant to Evidence Code sections 1360 and 1253 (hereafter sections 1360 and 1253). The Legislature added sections 1253 and 1360 to the Evidence Code in 1995, effective January 1, 1996. (Stats. 1995, ch. 87; Cal. Const., art. IV, § 8, subds. (c) & (d).)

Section 1360, which applies only in criminal proceedings, provides in pertinent part:

"(a) In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child

abuse or neglect performed with or on the child by another, or describing any attempted act of child abuse or neglect with or on the child by another, is not made inadmissible by the hearsay rule if all of the following apply:

"(1) The statement is not otherwise admissible by statute or court rule.

"(2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability.

"(3) The child either:

"(A) Testifies at the proceedings.

"(B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child.

"(b) A statement may not be admitted under this section unless the proponent of the statement makes known to the adverse party the intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings in order to provide the adverse party with a fair opportunity to prepare to meet the statement.

"(c) For purposes of this section, 'child abuse' [includes] an act proscribed by Section . . . 288.5 of the Penal Code . . . ."

Section 1253 provides a narrower hearsay exception, but applies in both civil and criminal actions. It provides in pertinent part: "Subject to Section 1252,[3] evidence of a statement is not made inadmissible by the hearsay rule if the statement was made for purposes of medical diagnosis or treatment and describes medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment. This section applies only to a statement made by a victim who is a minor at the time of the proceedings, provided the statement was made when the victim was under the age of 12 describing any act, or attempted act, of child abuse or neglect."

Appellant contends the hearsay statements were improperly admitted for several reasons. First, he contends sections 1360 and 1253 violate due

---

[3]Evidence Code section 1252 provides: "Evidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness."

process because they unfairly shift the "balance of forces" to the prosecution. Second, he contends it violates ex post facto principles to apply sections 1360 and 1253 to hearsay statements made in connection with an offense that occurred before the effective date of those statutes (Jan. 1, 1996).[4] Third, he contends that, in any event, the hearsay statements at issue in this case do not fall within the exceptions that section 1360 and 1253 create. We reject each of these arguments.

### 1. *Neither Section 1253 nor Section 1360 Violates Due Process.*

■ Relying on *Wardius* v. *Oregon* (1973) 412 U.S. 470 [93 S.Ct. 2208, 37 L.Ed.2d 82], appellant contends sections 1253 and 1360 violate due process because they provide a "nonreciprocal" benefit to the state. In appellant's words, "[b]oth sections limit the newly created hearsay exceptions to statements 'describing any act of child abuse or neglect' made by the 'victim' when under the age of 12. A statement 'describing an act of child abuse or neglect' made by a child 'victim' is by its very definition inculpatory. These two hearsay exceptions thus benefit prosecutors *exclusively*." (Italics added.)

We reject this argument because we disagree with appellant's premise that the new hearsay exceptions may only be used to benefit prosecutors. Nothing in the statutes explicitly limits the hearsay exceptions to evidence which is inculpatory and, as we explain below, occasions may arise in which the defense may find it useful to introduce hearsay testimony under these new exceptions.

In *Wardius* v. *Oregon, supra*, 412 U.S. 470, the United States Supreme Court reviewed an Oregon law which required the defendant to give notice of alibi witnesses to the prosecution but did not impose an explicit requirement that the prosecution give notice of the witnesses it intended to call to challenge the alibi. The court held this lack of reciprocity was fatal under the Fourteenth Amendment. (412 U.S. at pp. 471-473, 476 [93 S.Ct. at pp. 2210-2211, 2212-2213].) The *Wardius* court "stressed the unfairness of a discovery procedure that denied the defendant significant procedural benefits afforded the state, and thereby interfered with his ability to secure a fair trial." (*Whitman* v. *Superior Court* (1991) 54 Cal.3d 1063, 1082 [2 Cal.Rptr.2d 160, 820 P.2d 262]; *Wardius, supra*, 412 U.S. at p. 476 [93 S.Ct.

---

[4]The People correctly point out appellant did not raise these constitutional issues below, and cannot raise them on appeal. (*People* v. *Raley* (1992) 2 Cal.4th 870, 892 [8 Cal.Rptr.2d 678, 830 P.2d 712].) However, appellant claims in his accompanying petition for writ of habeas corpus that trial counsel was ineffective for failing to raise these issues below. Consequently, we address the merits of the contentions to show that counsel was not ineffective.

at pp. 2212-2213] ["It is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State."].)

Here, we do not perceive similar unfairness in sections 1253 and 1360. First, as we have noted, nothing in those sections limits the exception to "inculpatory" evidence. In fact, cases may frequently arise where the defense will find it useful to introduce evidence under these exceptions. This may occur, for example, where a court has admitted prosecution hearsay testimony under section 1360 on the ground the victim is unavailable as a witness. In these circumstances, the defense may seek to introduce *other* hearsay which meets the requirements of section 1360 or 1253 to *contradict* the details of the hearsay statements the prosecutor has introduced.[5] Thus, both the prosecution and defense may make use of these new exceptions to the hearsay rule. (See *Whitman* v. *Superior Court, supra,* 54 Cal.3d at p. 1082.)[6] Contrary to appellant's assertion, sections 1253 and 1360 do not create a one-way street in favor of the prosecution.

But even if sections 1360 and 1253 *did* create a one-way flow of evidence in favor of the prosecution, California Supreme Court authority suggests we would nevertheless have to reject appellant's due process challenge. In *Whitman* v. *Superior Court, supra,* 54 Cal.3d 1063, the defendant challenged Penal Code section 872. That section provides that a probable cause determination at a preliminary hearing may be based on hearsay statements related by a police officer with certain qualifications and experience. As here, the defendant cited *Wardius* and contended section 872 violated due process because it did not provide reciprocal benefits to the defense. (54 Cal.3d at p. 1082.) In distinguishing *Wardius* the *Whitman* court stated: "We find no similar unfairness here for, properly construed, the new hearsay statute contains no broad grant of authority to the prosecutor to rely on hearsay evidence. The section merely specifies a further, limited exception to the general hearsay exclusionary rule of Evidence Code section 1200, by allowing a probable cause finding to be based on certain hearsay testimony

---

[5] We note that in these circumstances, where the child victim is unavailable as a witness at trial, these statements would not be admissible under the prior inconsistent statement exception to the hearsay rule. (Evid. Code, § 1235 [statement must be inconsistent with the witness's "testimony at the hearing"].)

[6] In *Whitman* v. *Superior Court, supra,* 54 Cal.3d 1063, the court rejected an argument that Penal Code section 872—which allows the prosecution to establish probable cause at a preliminary hearing through hearsay testimony—was invalid for lack of reciprocity. In rejecting this argument, the court noted that ". . . although we leave the question open, the new provision might be interpreted as permitting *the defendant* to call a law enforcement officer to relate statements which might rebut a finding of probable cause." (54 Cal.3d at p. 1082, italics in original.)

by law enforcement officers having specified experience or training. In light of the specialized nature of the exception, we see nothing fundamentally unfair in failing to provide some similar hearsay exception favoring the defense. . . . Defendants continue to enjoy the benefits of all preexisting hearsay exceptions. (See Evid. Code, § 1220 et seq.).” (*Ibid.*)

The same is true here. Section 1253 and 1360 “merely specif[y] a further, limited exception to the general hearsay exclusionary rule.” Defendant continues to enjoy the benefits of all preexisting hearsay exceptions.

In sum, sections 1253 and 1360 do not violate due process.

2. *Ex Post Facto Argument.*

■ Appellant was charged with the continuous sexual abuse of a child between June 12, 1992, and December 31, 1994. Sections 1253 and 1360 became effective in January 1996. (Stats. 1995, ch. 87, §§ 2, 3; Cal. Const., art. IV, § 8, subds. (c) & (d).) Appellant contends it violates state and federal ex post facto principles to apply these provisions to an offense which occurred before their effective date. (U.S. Const., art. I, § 9, cl. 3; Cal. Const., art. I, § 9.) We disagree.

■ The California and federal ex post facto clauses are interpreted consistently. (*Tapia* v. *Superior Court* (1991) 53 Cal.3d 282, 295 [279 Cal.Rptr. 592, 807 P.2d 434].) “ ‘It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto.*’ ” (*Collins* v. *Youngblood* (1990) 497 U.S. 37, 42 [110 S.Ct. 2715, 2719, 111 L.Ed.2d 30], quoting *Beazell* v. *Ohio* (1925) 269 U.S. 167, 169-170 [46 S.Ct. 68, 68, 70 L.Ed. 216].)

This formulation omits an element from a much earlier formulation, which included: “ ‘Every law that alters the *legal* rules of *evidence,* and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender.’ ” (*Collins* v. *Youngblood, supra,* 497 U.S. at p. 42 [110 S.Ct. at p. 2719], quoting *Calder* v. *Bull* (1798) 3 U.S. (3 Dall.) 386, 390 [1 L.Ed. 648, 650] (per Chase, J.).) However, the *Collins* court explained that “[a]s cases subsequent to *Calder* make clear, this language was not intended to prohibit the application of new evidentiary rules in trials for crimes committed before the changes.

[Citations.]" (*Collins, supra,* at p. 43, fn. 3 [110 S.Ct. at p. 2719].) "[A] new rule of evidence which admits evidence not previously admissible or which extends competency to a witness may validly operate in the trial of a prior offense. [Citations.]" (*DeWoody* v. *Superior Court* (1970) 8 Cal.App.3d 52, 56 [87 Cal.Rptr. 210]; *People* v. *Fitch* (1997) 55 Cal.App.4th 172, 186 [63 Cal.Rptr.2d 753].)

Since sections 1253 and 1360 do not alter the definition of a crime, increase punishment, or eliminate a defense, it does not violate the ex post facto clause to apply them to offenses which occurred before their effective date.

Although appellant contends sections 1253 and 1360 have the substantive effect of "lighten[ing] the State's burden of proof in child sexual abuse cases" we cannot agree. (See *Tapia* v. *Superior Court, supra,* 53 Cal.3d at p. 298 & fn. 17 [concluding that statute which changed corpus delicti rule lessened the amount or measure of proof necessary for conviction].) Rather, the new statutes merely give the state a new source of evidence to meet the preexisting burden of proof. There is no ex post facto violation here.

### 3. *The Trial Court Properly Admitted the Hearsay Testimony.*

Finally, appellant contends that, in any event, the trial court erred in admitting the hearsay testimony because it did not meet the statutory requirements for admission set out in sections 1253 or 1360. We disagree.

At a pretrial *in limine* hearing, the prosecutor indicated it intended to offer pursuant to section 1253 and/or section 1360 all hearsay statements Athena had made to others describing the abuse. This included the hearsay statements Athena made to her grandmother (Estrelita), to her aunt (Angie), to the social worker (Jack Rodgers), to the police detective (Eric Solzman), to the nurse practitioner (Ms. Elliff), and to her therapist (Susan Kuhn). The court indicated it was willing to hold an Evidence Code section 402 hearing as to each witness before the hearsay was admitted.

During the trial, the court held a Evidence Code section 402 hearing on the admissibility of hearsay statements Athena had made to her aunt, Angie B. The court found those statements admissible under section 1360. No further section 402 hearings were requested or held. However, appellant objected to the hearsay testimony of Detective Solzman, Nurse Practitioner Elliff and Therapist Kuhn on the ground their hearsay testimony was not admissible under section 1253 or 1360.

a. *Section 1360.*

█ Appellant first contends the trial court erred when it admitted the hearsay testimony of Angie, Social Worker Rodgers, and Detective Solzman pursuant to section 1360.[7]

█ Section 1360 allows the court to admit a child's hearsay statement describing an act of child abuse upon that child provided three conditions are met: (1) the court finds that the time, content and circumstances of the statement provides sufficient indicia of reliability; (2) the child either testifies at the hearing or there is corroborating evidence of the hearsay statements; and (3) the proponent of the statement gives notice to the adverse party that it intends to use the statement at trial. (See *In re Cindy L.* (1997) 17 Cal.4th 15, 29 [69 Cal.Rptr.2d 803, 947 P.2d 1340].) █ Appellant does not contend the prosecution failed to meet the second or third requirements for admissibility. Rather, he contends the trial court should have excluded the evidence because the content and circumstances of the statements did not provide sufficient indicia of reliability. We disagree.

Our Supreme Court recently discussed the indicia of reliability requirement in *In re Cindy L., supra,* 17 Cal.4th 15. There, the court approved a judicially created hearsay exception for child dependency cases (*In re Carmen O.* (1994) 28 Cal.App.4th 908, 921 [33 Cal.Rptr.2d 848]) but clarified and augmented that exception by holding that the proponent of the evidence must meet three requirements before the evidence can be admitted. First, the court must find "that the time, content and circumstances of the statement provides sufficient indicia of reliability." Second, the child must be available for cross-examination or there must be evidence to corroborate the child's hearsay statements. And third, the proponent must provide adequate notice of its intent to use the hearsay evidence. (*In re Cindy L., supra,* 17 Cal.4th at p. 29.) The court explicitly acknowledged that these requirements were derived, in part, from the statutory requirements now found in section 1360. (17 Cal.4th at p. 29 & fn. 7.)

The court noted it would not overturn the lower court's conclusion that hearsay evidence was admissible under the child dependency exception unless the court had abused its discretion. (*In re Cindy L, supra,* 17 Cal.4th at p. 35.) With respect to the indicia of reliability requirement, which

---

[7]Appellant does not challenge the admissibility of Estrelita's (Athena's grandmother) hearsay testimony in his appeal, but does contend in his petition for writ of habeas corpus that trial counsel was ineffective because he should have objected to this testimony. In light of the fact we find the other hearsay testimony admissible, it is simply not reasonably probable appellant would have obtained a more favorable result had trial counsel objected to Estrelita's testimony. (*People* v. *Williams* (1997) 16 Cal.4th 153, 215 [66 Cal.Rptr.2d 123, 940 P.2d 710].)

concerns us here, the court stated it would consider the following nonexclusive factors in determining whether the statement was reliable: (1) spontaneity and consistent repetition; (2) mental state of the declarant; (3) use of terminology unexpected of a child of similar age; and (4) lack of motive to fabricate. (*Id.*, at pp. 29-30, citing *Idaho* v. *Wright* (1990) 497 U.S. 805, 821-822 [110 S.Ct. 3139, 3149-3150, 111 L.Ed.2d 638].) The court further held that, even if the child was incompetent to testify at trial because he or she did not understand the duty to tell the truth, this did not necessarily render the child's hearsay statements unreliable, but was merely a factor to consider. (*In re Cindy L, supra,* 17 Cal.4th at pp. 31-36.)

In our view, the court did not abuse its discretion when it found the hearsay statements Athena had made to her aunt, Detective Solzman, and Rodgers were reliable. First, although those statements were not exactly spontaneous, Athena consistently repeated them, with minor variations, to at least five adults. Second, there is nothing about Athena's mental state at the time she made the statements which indicates the statements were unreliable. Third, although Athena consistently used language (such as "peck-peck" and "teck-teck") that one would expect of a child of similar age, her description of the sexual acts showed a knowledge of such matters far beyond the ordinary familiarity of a child of her age. (*State* v. *Sorenson* (1988) 143 Wis.2d 226 [421 N.W.2d 77, 85-86], cited in *Idaho* v. *Wright, supra,* 497 U.S. at p. 821 [110 S.Ct. at pp. 3149-3150].) Finally, as appellant himself admitted, Athena had no clear motive to invent the accusations against *him*. Moreover, unlike *Cindy L.*, where the Supreme Court nevertheless found the child's hearsay statements admissible, here the declarant was found competent to testify at trial. Thus, based on the factors our Supreme Court has outlined in *Cindy L.*, we conclude the trial court did not abuse its discretion when it found Athena's hearsay statements to be reliable and admissible under section 1360. (*In re Cindy L., supra,* 17 Cal.4th at pp. 34-36.)

b. *Section 1253.*

■ Appellant also contends the court erred in admitting the hearsay testimony of nurse practitioner Elliff and therapist Kuhn pursuant to section 1253. We disagree.[8]

Section 1253 provides, in substance, that hearsay statements of a child victim describing any act, or attempted act, of child abuse or neglect are admissible if the statement was made for purposes of medical diagnosis or treatment and describes medical history as reasonably pertinent to diagnosis

---

[8]We note this testimony might also have been admissible under section 1360. However, since we conclude it is admissible under section 1253, we do not address that issue.

or treatment. Such evidence is inadmissible if the statement was made under circumstances such as to indicate its lack of trustworthiness. (Evid. Code, § 1252.)

Appellant first contends Athena's hearsay statements to Nurse Elliff were not admissible under section 1253 because (1) she did not go to her for diagnosis or treatment and (2) Athena's statements identifying appellant as her attacker were clearly not pertinent to her diagnosis or treatment. We disagree.

There are presently no cases which interpret section 1253. However, that section is patterned after rule 803(4) of the Federal Rules of Evidence (28 U.S.C.), which applies to *all* statements made for the purpose of medical diagnosis or treatment. Rule 803(4) makes admissible "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." This language is essentially identical to that found in section 1253. (See text, *ante,* p. 1324.)

The federal courts have consistently held that a child's statements describing the nature and circumstances of sexual abuse, made in the course of a child sexual abuse examination, such as the one nurse Elliff performed here, are admissible under the rule as they are reasonably pertinent to diagnosis or treatment. (*U.S.* v. *Tome* (10th Cir. 1995) 61 F.3d 1446, 1450; *U.S.* v. *Balfany* (8th Cir. 1992) 965 F.2d 575, 579-580; *United States* v. *Nick* (9th Cir. 1979) 604 F.2d 1199, 1201-1202.) Moreover, although a declarant's statement to a physician that identifies the person responsible for the declarant's injuries is ordinarily inadmissible under Federal Rules of Evidence, rule 803(4) (28 U.S.C.), a hearsay statement revealing the identity of a sexual abuser who is a member of the victim's family or household is admissible where the abuser has such an intimate relationship with the victim that the abuser's identity becomes reasonably pertinent to the victim's proper treatment. This is because "[a]ll victims of domestic sexual abuse suffer emotional and psychological injuries, the exact nature and extent of which depend on the identity of the abuser. The physician generally must know who the abuser was in order to render proper treatment because the physician's treatment will necessarily differ when the abuser is a member of the victim's family or household." (*U.S.* v. *Joe* (10th Cir. 1993) 8 F.3d 1488, 1494-1495, fn. omitted; *U.S.* v. *Tome, supra,* 61 F.3d at p. 1450.)

Thus, the statements Athena made to nurse Elliff were admissible, including the statement identifying appellant, a member of her family, as the abuser.

Finally, appellant contends the court erred in admitting the hearsay statements related by Therapist Kuhn because (1) section 1253 only applies to medical (not psychological) diagnosis; (2) therapist Kuhn was only an intern, not a licensed psychotherapist; and (3) the circumstances surrounding the statements indicate a lack of trustworthiness. Again, we disagree.

Federal Rules of Evidence, rule 803(4) (28 U.S.C.), like section 1253, is limited to "[s]tatements made for purposes of *medical* diagnosis or treatment." (Italics added.) Nevertheless, the federal courts have consistently held that a child's statements describing sexual abuse, and the identity of the abuser, which are made to a psychologist for the purpose of obtaining *psychological* diagnosis are admissible under rule 803(4). (*U.S.* v. *Yellow* (8th Cir. 1994) 18 F.3d 1438, 1442; *U.S.* v. *Farley* (10th Cir. 1993) 992 F.2d 1122, 1125; *U.S.* v. *Balfany, supra,* 965 F.2d at pp. 579-581; *U.S.* v. *Provost* (8th Cir. 1989) 875 F.2d 172, 176-177; *United States* v. *Renville* (8th Cir. 1985) 779 F.2d 430, 435.) Appellant has offered no reason why we should break from this line of federal authority.

Second, it does not matter that Therapist Kuhn was not licensed at the time Athena spoke with her. Nothing in section 1253 requires the hearsay statements be made to a licensed physician or psychologist. To the contrary, under Federal Rules of Evidence, rule 803(4) (28 U.S.C.), statements to hospital attendants, ambulance drivers or even members of the family are admissible provided they meet the explicit requirements for admissibility set out in the rule. (*Morgan* v. *Foretich* (4th Cir. 1988) 846 F.2d 941, 949, fn. 17.) We see no reason to apply a different interpretation to section 1253.

Finally, we cannot agree that Athena's statements to Kuhn, and particularly her written statement, indicate a lack of trustworthiness. Again, although those statements were not spontaneous, Athena consistently repeated them (with minor variations) to at least five adults. Second, there is nothing about Athena's mental state at the time she made the statements which indicates the statements were unreliable. Third, Athena's description of the sexual acts showed a knowledge of such matters far beyond the expected level of a child her age. In our view, appellant has not shown the statements were made "under circumstances such as to indicate [their] lack of trustworthiness." (Evid. Code, § 1252.)

B.-F.*

. . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante,* page 1312.

## G. *The Habeas Corpus Petition.*

As we indicated in the introduction, we have consolidated appellant's petition for writ of habeas corpus with this appeal.

■ An appellate court receiving a petition for writ of habeas corpus must first determine whether, taking the allegations of the petition as true, it establishes a prima facie case for relief. If the petition does not state a prima facie case for relief, it must be summarily denied. (*People* v. *Romero* (1994) 8 Cal.4th 728, 737 [35 Cal.Rptr.2d 270, 883 P.2d 388].) ■ We conclude the petition fails to state a prima facie case for relief, and we therefore summarily deny it.

In his petition, appellant contends his trial counsel was ineffective because (1) he failed to present evidence showing appellant did not fit the psychological profile of a child molester; and (2) he failed to warn appellant that, by agreeing to a continuance, appellant would permit the prosecution to rely on the new child molestation hearsay exceptions (§§ 1253 & 1360) which became effective January 1, 1996.[13] We reject these arguments.

■ "In order to establish a violation of the right to effective assistance of counsel, a defendant must show that counsel's performance was inadequate when measured against the standard of a reasonably competent attorney, and that counsel's performance prejudiced defendant's case in such a manner that his representation 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' (*Strickland* v. *Washington* (1984) 466 U.S. 668, 686 . . . .) Moreover, 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.' (*Strickland, supra,* 466 U.S. at p. 697 . . . .) Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.] If defendant fails to show that he was prejudiced by counsel's performance, we may reject his ineffective assistance claim without determining whether counsel's performance was inadequate. [Citation.]" (*People* v. *Sanchez* (1995) 12 Cal.4th 1, 40-41 [47 Cal.Rptr.2d 843, 906 P.2d 1129].)

---

[13]Appellant also contends his trial counsel was ineffective for failing to challenge Evidence Code sections 1253 and 1360 on due process and ex post facto grounds. We have already rejected the merits of those arguments, and consequently trial counsel was not ineffective for failing to raise them at trial.

### 1. *Psychological Evidence.*

█ Dr. David Stein, a psychologist, interviewed appellant in prison after trial and administered a series of psychological tests. Based on these tests and interviews, Dr. Stein concluded appellant does not exhibit the usual characteristics of a resident child molester.

Although a defendant may be permitted to introduce expert character evidence, based on standardized tests and personal interviews, to the effect that his personality profile does not include a capacity for deviant behavior against children (*People* v. *Jones* (1990) 51 Cal.3d 294, 320 [270 Cal.Rptr. 611, 792 P.2d 643]; *People* v. *Stoll* (1989) 49 Cal.3d 1136, 1161 [265 Cal.Rptr. 111, 783 P.2d 698]), defense counsel may have had sound tactical reasons for not going down that path in this case. For example, defense counsel could have feared that opening this door on appellant's personality would have permitted the prosecution to introduce damaging rebuttal character evidence. (Evid. Code, § 1102, subd. (b); *People* v. *Stoll, supra,* 49 Cal.3d at p. 1159.) Appellant has not overcome the presumption that trial counsel had a sound tactical reason for passing on this evidence. (*Strickland* v. *Washington* (1984) 466 U.S. 668 [104 S.Ct. 2052, 80 L.Ed.2d 674] [defendant must overcome the presumption that the challenged conduct might be considered sound trial strategy].) The mere fact counsel did not discuss this option with appellant does not indicate a lack of a tactical basis for rejecting the option.

But even if this evidence had been admitted, we conclude there is no reasonable probability the result of the proceeding would have been different. In the People's words: "[I]t is highly unlikely that the subjective opinion of one defense-retained psychologist, based on one ninety-minute interview and a few standardized tests, that [appellant] did not fit the profile of a 'typical' residential child molester would have changed the result in this case." We agree. As our Supreme Court has observed, ". . . no reasonable juror would mistake an expert's reliance on standardized tests as a source of infallible 'truth' on issues of personality, predisposition, or criminal guilt." (*People* v. *Stoll, supra,* 49 Cal.3d at p. 1159.)[14] Appellant has failed to establish either prong of an ineffective assistance claim.

### 2. *Failure to Advise on Continuance.*

█ Finally, appellant contends trial counsel was ineffective because he failed to advise appellant of the adverse consequences of agreeing to a

---

[14]Although the Supreme Court found the erroneous exclusion of psychological evidence prejudicial in *People* v. *Stoll, supra,* 49 Cal.3d at pages 1162-1163, we reach a different conclusion on the facts of this case. Here, there was no question about the identity of the molester, there was no apparent reason to invent the accusations, and there were no conflicting eyewitness testimony by other participants. (Cf. *Ibid.*)

continuance: namely, that the prosecution would be able to rely on recently enacted hearsay exceptions to introduce the victim's inculpatory hearsay statements.

The prosecution filed the information on May 4, 1995. Appellant repeatedly waived time for trial, and trial was eventually set for October 10, 1995. On October 5, 1995, over a prosecution objection, the trial court granted a defense motion to continue trial until October 13, 1995. The matter trailed until October 19, 1995. On October 19, 1995, without defense objection, the trial court granted a prosecution motion to continue the trial until January 16, 1996. Appellant waived time to that date. Subsequently the trial court granted *defense* requests to continue the matter to January 22 and then April 8, 1996. Trial finally commenced on April 15, 1996.

In the meantime, the Legislature enacted sections 1253 and 1360 in July of 1995, effective January 1, 1996. (Stats. 1995, ch. 87, §§ 2, 3; Cal. Const., art. IV, § 8, subds. (c) & (d).) As previously discussed, those sections create new hearsay exceptions for certain statements by child sexual abuse victims. The trial court admitted evidence pursuant to those sections.

Appellant claims trial counsel was ineffective because he failed to warn him that, by consenting to the prosecution's request to continue the trial from October 1995 to January 1996, he would enable the prosecution to introduce hearsay evidence under sections 1253 and 1360. Appellant submits his own declaration stating he wanted an early trial from the outset, but that counsel pressured him to waive his right to speedy trial and to consent to repeated delays. He also claims defense counsel never told him about the new statutes that would go into effect after January 1, 1996, and had counsel done so, he would not have consented to any delays in his trial date. Appellant has not obtained a declaration from defense counsel explaining his reasons for recommending that appellant agree to the repeated continuances. However, in a written statement which he submitted to his probation officer, appellant stated it was his "understanding" defense counsel urged him to waive time to allow counsel more time to prepare his defense.

 "In determining whether counsel's performance was deficient, a court must in general exercise deferential scrutiny [citation]" and must ". . . view and assess the reasonableness of counsel's acts or omissions . . . under the circumstances as they stood at the time that counsel acted or failed to act." (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 216 [233 Cal.Rptr. 404, 729 P.2d 839].) "Although deference is not abdication . . . courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight." (*People* v. *Scott* (1997) 15 Cal.4th 1188, 1212 [65 Cal.Rptr.2d

240, 939 P.2d 354].) "[I]f the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . .' " (*People* v. *Cudjo* (1993) 6 Cal.4th 585, 623 [25 Cal.Rptr.2d 390, 863 P.2d 635].)

 Here, there is no express explanation for trial counsel's decision to urge appellant to agree to a continuance to January of 1996. However, the record, including appellant's own statement, indicates defense counsel believed he needed this time to prepare his defense. Thus, even if trial counsel were aware the new hearsay provisions would become effective on January 1, 1996, he could reasonably conclude appellant would be better served by using the extra time to adequately research and prepare a defense. Again, "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight." (*People* v. *Scott, supra,* 15 Cal.4th at p. 1212.)

Moreover, as the People point out, even if the trial court had denied the prosecution's request for continuance, if the People were determined to commence trial after January 1, 1996, they could have dismissed the case and then simply refiled the charges. (Pen. Code, § 1387.) Although appellant contends this would be "prosecutorial misconduct of the first magnitude," he cites no authority to support this proposition, and no reasons why it would be "misconduct" for the prosecutor to delay a trial in order to take advantage of favorable statutory changes.

In sum, we conclude appellant has again failed to establish counsel's performance fell below that to be expected of a reasonably diligent advocate, or that counsel's action actually prejudiced his defense.

### III

### DISPOSITION

The judgment is affirmed and the petition for writ of habeas corpus is summarily denied.

Phelan, P. J., and Corrigan, J., concurred.

A petition for a rehearing was denied March 30, 1998, and appellant's petition for review by the Supreme Court was denied June 10, 1998.