Filed 6/12/14  P. v. Kon CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G047935 |
| v. | (Super. Ct. No. 10HF1805) |
| KENNETH KON, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Dan McNerney, Judge.  Affirmed as modified.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Parag Agrawal, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

The information charged defendant Kenneth Kon with one count each of sexual penetration of a child 10 years old or younger (Pen. Code, § 288.7, subd. (b); count one) and lewd act on a child under 14 years old (Pen. Code, § 288, subd. (a); count two). It further alleged defendant engaged in substantial sexual conduct (masturbation) during the commission of the offense charged in count two. (Pen. Code, § 1203.066, subd. (a)(8).) The jury found defendant guilty of both offenses and found the special allegation true. The court sentenced defendant to 15 years to life and imposed restitution and parole revocation fines of $240.[1] Defendant contends the court erred in admitting evidence pursuant to Evidence Code section 1360 and in instructing the jury pursuant to CALCRIM No. 318. He further contends the trial court erred in imposing $240 restitution and parole revocation fines, as the court intended to impose the minimum possible fines and the minimum fine at the time he committed his crimes was $200. The court in this case inarguably intended to impose the minimum possible fines, so we will order the abstract of judgment amended to reflect restitution and parole revocation fines in the amount of $200. We will affirm the judgment in all other respects.

I

FACTS

M.A., the victim, was best friends with defendant's daughter J.K. and spent four to seven nights a month at defendant's home when she was in the third grade. On October 5, 2010, while her father Mark was putting nine-year-old M.A. to bed, she told him she did not want to go to the Kon house to spend the night anymore. Her father asked her why, and she said it was because defendant touched her in a way she did not like and hurt her "a little bit." She pointed to her vaginal area as the area defendant touched.

---

[1] The parole revocation fine was stayed pending successful completion of parole.

Mark told his wife T.A. what M.A. said. T.A. then spoke with M.A. M.A. told her defendant "was touching" her on her bottom or vaginal area.

T.A. went to the Irvine Police Department the next day and left her contact information. Later that day, Officer Jennifer Johnsen called the telephone number T.A. left and spoke with Mark. Mark asked Johnsen to come to their home and take a report. Johnsen went to the residence and spoke with Mark on the front porch. He told Johnsen what M.A. said to him.

Detective Timothy Schilling arrived while Johnsen was speaking with T.A. on the porch. Schilling interviewed M.A. and recorded the interview. M.A. told Schilling what happened at defendant's house. She pointed to her crotch when she told the detective where defendant touched her. She said defendant stuck his finger inside of her "uterus."[2]

M.A. told another detective the last time she spent the night at defendant's house was before that school year started. She had on her long sleeve and pants pajamas and was in J.K.'s bedroom. J.K. and M.A. went to bed. After M.A. fell asleep, defendant entered the bedroom and approached J.K.'s bed on M.A.'s side and touched M.A. in a way she did not like. Initially defendant rubbed her back over the top of her pajamas. Then he touched the back of her legs. M.A. said defendant "stuck his finger in my, uh, right here." When asked what she calls that part of her body, M.A. said, "uterus." She said it hurt, but she pretended to be asleep. She knew it was defendant, because she saw his face. When asked how many times defendant touched her, she said "a lot," 11 or 12 times. The first time it happened she was in the third grade. M.A. said she told J.K. what defendant had done after the last sleepover.

Two days after her interview with Schilling, M.A. was interviewed by a social worker on the Child Abuse Service Team (CAST). The CAST interview was

_____

[2] M.A. testified "uterus" was the term she used for her vagina or the opening to her vagina.

3

recorded and the DVD of the interview was played for the jury. M.A. again described what defendant did to her and reiterated defendant put his finger in her vagina (again calling it her uterus). The social worker gave M.A. a drawing of a female and asked her to circle where defendant touched her. When asked what she called the circled areas, M.A. said "bum" and "vagina." She said defendant's hand was inside her underwear and his finger was inside her "uterus" for what seemed like 10 to 15 minutes. It hurt because he had long fingernails and his finger "kinda squirmed" inside of her, with defendant "digging his finger" inside of her. She again stated defendant touched her vagina and "bum" on 11 or 12 occasions when she spent the night with J.K., but he only penetrated her the one time.

At trial, M.A. testified defendant started touching her vagina under her clothing during the second or third grade. She reiterated that defendant pushed his finger into her vagina on the last occasion and it felt like he was "digging or squirming" with his finger.

T.A. made a covert call to defendant from the police department on October 6, 2010. The call was recorded and played for the jury. T.A. told defendant M.A. had said he touched her in "private places." Defendant said he did not, but he "may have accidentally." He said he may have touched her thinking it was J.K. He said there was one night when he thought he was rubbing J.K.'s back and saw he was rubbing M.A.'s. He said he may have accidentally touched "her private part." Defendant later said he probably touched M.A.'s "butt." T.A. told defendant she knew something more than a back rub happened and defendant said, "Yeah." At one point defendant said, "What she's said, ah, whatever she said, you know, I won't, I don't want to dispute with you whatever she said might have been true." He said he was tired that night and he might have touched her. Defendant said he "may have touched her inappropriately." T.A. asked where, and defendant said it was "on her butt." He then said it was "somewhere low." He added he may have touched her on her private part with his hand, but it was not

4

intentional. He said he "didn't put my finger all the way." When asked how many times he touched M.A., defendant said he did not count the times. He denied touching her vagina, and said he apologizes if he touched her inappropriately. Toward the end of the call, defendant said he rubs his daughter's back and one night he did not realize he was rubbing M.A. He admitted he touched M.A. inappropriately and denied putting his finger in her vagina, but added it may have felt like than when he "touched her on her butt." Defendant said he apologized to M.A. at the time and told her he would not touch her anymore.

Schilling subsequently interviewed J.K. She said M.A. complained in the past about defendant touching her. Schilling also interrogated defendant. Defendant admitted fondling M.A. and touching her under her clothes. He said his finger may have brushed over her anus, and touched her vagina. Eventually he conceded the tip of his finger may have penetrated M.A.'s vagina: "I may have touched her but I did not intentionally put my finger all the way."

*Defense Evidence*

Rosa Rosenstein and her 14-year-old daughter Sara testified on defendant's behalf. Rosa is a close friend of defendant and his wife Michelle. Rosenstein said defendant is truthful, honest, and a caring and doting father who is very gentle with his daughters. She said she is comfortable with Sara spending the night at the Kon residence.

Sara is friends with J.K. and has spend nights at the Kon residence on sleepovers. She is comfortable around defendant and trusts him. Sara said defendant has always been respectful and appropriate toward his daughters and her. She said defendant has never touched her private parts. Three other witnesses testified defendant is truthful, honest, and respectful toward children.

Defendant's wife of 16 years, Michelle, testified she does not believe M.A.'s accusations. She and defendant have two daughters, J.K. and her younger sister,

5

H.K.  She said she has no reason to believe defendant is sexually attracted to young girls. She has never seen defendant act inappropriately around children and has never seen children act hesitantly and reserved around him.  Neither has Michelle seen M.A. act awkwardly around defendant.

Michelle said J.K. likes defendant to rub her back and asked him for a back rub every night, even when she had a friend over for a sleepover.  Defendant or Michelle, and sometimes both, would tuck the girls in at night.  M.A. slept with J.K. in her queen bed on sleepovers, unless J.K.'s sister wanted to sleep with J.K., in which case M.A. would sleep on H.K.'s twin mattress.  Michelle never saw defendant give M.A. hugs, rub her back, or touch her.  Michelle denied telling a police officer defendant said he had touched M.A. the last time she spent the night at their house.

Dr. Laura Brodie, a clinical and forensic psychologist, performed the Abel Assessment on defendant.  The Abel Assessment is an objective means used to test an individual's sexual interest in different ages.  It is considered one of the most accurate test for determining sexual interest.  Brodie determined defendant does not have a deviant interest in prepubescent females.

II

DISCUSSION

Prior to the start of trial, the prosecutor filed a motion seeking the introduction of certain out-of-court statements of M.A.  Specifically, the prosecutor sought admission of M.A.'s statements to her parents about having been molested under the fresh complaint doctrine, and her statements to her parents, the police, and those made during her CAST interview pursuant to Evidence Code section 1360.[3]  Defense counsel did not object to the admission of the evidence with one exception:  she objected to statements made by M.A. in the CAST interview on due process grounds.  The

_____

[3] All further statutory references are to the Evidence Code unless otherwise designated.

6

purported due process violation consisted of obtaining the statements without counsel being present. The court overruled the objection. Defendant's first two arguments on appeal relate to this evidence. He contends the court erred in admitting M.A.'s out-of-court statements under section 1360 and in instructing the jury pursuant to CALCRIM No. 318.

A. *Admission of the Evidence*

A "trial court is vested with wide discretion in determining the admissibility of evidence." (*People v. Karis* (1988) 46 Cal.3d 612, 637.) We review the trial court's evidentiary rulings for an abuse of process. (*People v. Hamilton* (2009) 45 Cal.4th 863, 930.) An abuse of discretion will be found only when the trial court's decision is found to be arbitrary, capricious, or whimsical and "exceeds the bounds of reason, all of the circumstances being considered. [Citations.]" (*People v. Giminez* (1975) 14 Cal.3d 68, 72.) We review the admission of evidence de novo when the issue is whether admission of evidence violated the defendant's constitutional rights. (*People v. Cromer* (2001) 24 Cal.4th 889, 893-894.)

Defendant contends the trial court erred in admitting out-of-court statements made by M.A. for their truth under section 1360. The statements complained of are those M.A. made during the CAST interview, her statements to Detective Schilling, and her statements to her parents about the acts of defendant. Although he argues the statements M.A. made to her parents were admitted under the fresh complaint doctrine and therefore were admitted only for the purpose of showing she complained about defendant's acts and not for the truth of the complaint (*People v. Brown* (1994) 8 Cal.4th 746, 760), he included those statements in this argument in the event we find the statements to her parents were admissible pursuant to section 1360 and could be considered for their truth.

Section 1360 provides as follows: "(a) In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed with or on the child by another, or describing any attempted act of child abuse or neglect with or on the child by another, is not made inadmissible by the hearsay rule if all of the following apply:

"(1) The statement is not otherwise admissible by statute or court rule.

"(2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability.

"(3) The child either:

"(A) Testifies at the proceedings.

"(B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child.

"(b) A statement may not be admitted under this section unless the proponent of the statement makes known to the adverse party the intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings in order to provide the adverse party with a fair opportunity to prepare to meet the statement.

"(c) For purposes of this section, 'child abuse' means an act proscribed by Section 273a, 273d, or 288.5 of the Penal Code, or any of the acts described in Section 11165.1 of the Penal Code, and 'child neglect' means any of the acts described in Section 11165.2 of the Penal Code."[4]

---

[4] The offenses charged in the information qualify as "child abuse" for purposes of section 1360. (See Pen. Code, §11165.1, subd. (a) [lewd or lascivious acts upon a child].)

8

Defendant complains the evidence should not have been admitted because a perquisite to admissibility—a hearing conducted outside the presence of the jury wherein the court finds "the time, content, and circumstances of the statement provide sufficient indicia of reliability" (§ 1360, subd. (a)(2))—did not occur. We reject his argument.

Prior to the taking of evidence, the prosecution filed a motion to admit M.A.'s statements to her parents under the fresh complaint doctrine, and her statements to her parents, the detective, and the social worker during the CAST interview pursuant to section 1360. When the court and counsel took up the issue, the court asked defense counsel if she had any objections to admission of the evidence. Defense counsel's only objection was that she was not present during the CAST interview of M.A. There were no objections to any of the other evidence to be admitted under section 1360. From defense counsel's statement, the court may have concluded counsel agreed the statements possessed sufficient indicia of reliability for purposes of admission into evidence.

But even if we were to find the court erred in failing to conduct a hearing out of the presence of the jury before admitting M.A.'s out-of-court statements, any error would be harmless because the evidence was reliable. M.A., not an adult, first brought up the fact that she did not want to spend nights at her best friend's house anymore because defendant had been touching her in ways she did not like. The statements she thereafter made to her father and mother were consistently repeated to the detective, to the social worker in the CAST interview, and at trial. Additionally, there is nothing about M.A.'s mental state at the time she made the statements to suggest the statements were not reliable. Defendant does not suggest M.A. had a motive to invent the accusations against him. (See *People v. Brodit* (1998) 61 Cal.App.4th 1312, 1330 [factors suggesting reliability].)

Neither is there any reason to conclude her statements to the detective and the social worker in the CAST interview were not reliable. M.A.'s multiple statements in this matter remained consistent. Her statements to the detective were recorded and the

9

jury was provided transcripts of the interview.  In addition, the jury saw the DVD of the CAST interview, and how M.A. conducted herself.  There was nothing in her statements or her conduct at the CAST interview to indicate her statements were unreliable.  M.A.'s statements to the detective and the social worker were admissible under section 1360.

M.A.'s statements to her parents were also admissible under section 1360. We have been cited to nothing in the record indicating the court admitted M.A.'s statements solely as a fresh complaint, i.e., not for the truth of the matter asserted in the complaint.  As noted earlier, the prosecutor's motion sought admission of M.A.'s statement to her parents as a fresh complaint *and* pursuant to section 1360.

We reject defendant's argument that admitting evidence of M.A.'s statements, without the court making a finding of reliability at a hearing before the evidence is admitted requires reversal.  It is not the trial court's finding of reliability that is constitutionally required; it is the *reliability* of the evidence that is required.  (*Michigan v. Bryant* (2011) 526 U.S. ___, ___, fn. 13 [131 S.Ct. 1143, 1162, fn. 13] [due process may bar admission of "unreliable evidence"].)  And, we found the evidence was reliable.

Moreover, defendant's damning admissions would render any error harmless regardless of the test used.  (*Chapman v. California* (1967) 386 U.S. 18, 24 [harmless beyond a reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [reasonably probable a different result would have occurred absent error].)  He admitted touching M.A. inappropriately.  He even admitted he may have penetrated her vagina with his finger, qualifying the statement with "but I did not intentionally put my finger *all the way* [in]."  (Italics added.)  Of course, only slight penetration is required.  (Cf. *People v. Quintana* (2001) 89 Cal.App.4th 1362, 1366 [penetration of *external* genital organs sufficient for rape]; Pen. Code, § 286, subd. (a) [slight penetration sufficient for crime of sodomy].)  Further, M.A.'s testimony was consistent with her out-of-court statements.

10

B.  *CALCRIM No. 318*

The court instructed the jury pursuant to CALCRIM No. 318:  "'You've heard evidence of statements witnesses made before trial.  If you decide those witnesses made those statements, you may consider those statements in two ways:  [¶] 1. To evaluate whether the witness's testimony in court is believable, and [¶] 2. As evidence the information in the earlier statement was true.'"  Defendant asserts the court erred in instructing the jury in the terms of CALCRIM No. 318 because evidence of M.A.'s statements to her parents were admitted for a limited purpose under the fresh complaint doctrine and not for their truth.

Although defendant contends M.A.'s statements to her parents were admitted under the fresh complaint doctrine and not pursuant to section 1360, he fails to support the contention with citations to the record.[5]  While defense counsel stated she had no objection to the statements to M.A.'s parents being admitted into evidence as fresh complaints, the prosecutor sought admission of the statements under section 1360 as well and counsel stated no objection.

As we have found all of M.A.'s out-of-court statements, including her statements to her parents, were reliable and admissible pursuant to section 1360, there is no need to address whether the CALCRIM No. 318 would be improper when evidence of a prior statement was not admitted for its truth, or whether defense counsel was ineffective for failing to object to the instruction.

---

[5] Defendant cites to a page of the reporter's transcript from the hearing on the prosecutor's motion.  However, the reference does not support defendant's contention.  In the cited portion of the transcript, the court addressed defense counsel's due process objection to admission of statements made in the CAST interview.  The court did not refer to the admissibility of M.A.'s statements to her parents, or the detective for that matter.

11

C. *Restitution Fines*

At the time of the offenses in 2010, the minimum restitution and parole revocation fines were $200. (Pen. Code, former § 1202.4, subd. (b)(1) as amended by Stats. 2007, ch. 302, § 14.)[6] On January 1, 2012, the statutory minimum restitution fine was increased to $240, and on January 1, 2013, the minimum restitution fine was increased to $280 (Pen. Code, § 1202.4, subd. (b)(1)).

When the court sentenced defendant, it imposed a $200 state restitution fine and a $200 parole revocation fine, which it ordered stayed pending successful completion of parole. Moments after having done so, the court stated, "I have been made aware that the state restitution fine has been increased as of January to $280. That will be the order. $280." The clerk then informed the court the $280 minimum restitution fine would not apply to defendant because his conviction occurred in 2012, and the minimum restitution fine at that time was $240. The court then changed the restitution and parole revocation fines again to $240.

Defendant maintains the court intended to impose the minimum restitution fine and as the minimum fine at the time of his offenses was $200, the abstract of judgment should be amended to reflect a state restitution fine of $200 and a parole revocation fine of $200. The Attorney General contends the issue has been forfeited by counsel's failure to object at the time of sentencing, counsel was not ineffective for failing to object because the $240 fines imposed are within the range of permissible fines, and any claim that the court "clearly intended" to impose the minimum fine is pure speculation.

That the court intended to impose the minimum fine is not speculation. The court first imposed what had been the minimum possible fine, $200. When it was

---

[6] Subdivision (a) of Penal Code section 1202.45 requires the court to impose a parole revocation fine in the same amount as the restitution fine imposed pursuant to Penal Code section 1202.4.

informed the new minimum fine was $280, the court corrected itself and imposed $280 fines. Then it changed the order again when the clerk said the $280 minimum fine did not apply and the minimum fine was $240. The court then changed the fine for a second time, to $240. Thus, in three attempts at imposing restitution and parole revocation fines, the court imposed what it believed was the minimum possible fine each time. There can be no more convincing evidence of the intent to impose the minimum possible fines.

The Attorney General is correct that the issue has been forfeited by counsel's failure to object (*People v. Dickerson* (2004) 122 Cal.App.4th 1374, 1386-1387), but we address the issue in order to forestall an ineffective assistance of counsel claim (*People v. Turner* (1990) 50 Cal.3d 668, 708).

"Under the United States Constitution, ""'any statute [1] which punishes as a crime an act previously committed, which was innocent when done; [2] which makes more burdensome the punishment for a crime, after its commission, or [3] which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*.'"" [Citations.] The ex post facto clause of the state Constitution is in accord. [Citation.]" (*People v. Saelee* (1995) 35 Cal.App.4th 27, 30.) The Attorney General concedes the applicable version of Penal Code section 1202.4 was the one in existence at the time defendant committed his offenses.

A restitution fine constitutes punishment for purposes of the ex post facto clause. (*People v. Souza* (2012) 54 Cal.4th 90, 143.) An increase in the minimum restitution fine makes the authorized punishment more burdensome. (*People v. Saelee*, *supra*, 35 Cal.App.4th at pp. 30-31.) Therefore, the court could not apply an increased *minimum* restitution fine retroactively to defendant, whose crime occurred prior to the increase in the minimum restitution fine. Of course the court was authorized to impose a $240 restitution fine, given the fact the statute in existence at the time of defendant's offenses authorized a restitution fine of not less than $200 and not more than $10,000

13

(Pen. Code, former § 1202.4, subd. (b)(2); Stats. 2009, ch. 454, § 1), but if the court clearly intended to impose the minimum possible fine, as indisputably occurred here, the amount is $200.

III

DISPOSITION

The abstract of judgment is ordered corrected to reflect Penal Code section 1202.4 and 1202.45 fines in the amount of $200.  The clerk of the trial court is directed to prepare an amended abstract of judgment reflecting a $200 Penal Code section 1202.4 restitution fine and a $200 Penal Code section 1202.45 revocation fine.  The clerk of the trial court is further directed send a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

MOORE, J.

WE CONCUR:


O'LEARY, P. J.


RYLAARSDAM, J.

14